## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Mountain Marketing Group, LLC, and John A. Krueger d/b/a Krueger Law Firm,<br><br>        Plaintiffs,<br><br>v.<br><br>Heimerl & Lammers, LLC,<br><br>        Defendant. | Case No. 14-cv-846 (SRN/BRT)<br><br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

David P. Jendrzejek, Glen E. Schumann, and Taylor D. Tarvestad-Sztainer, Moss & Barnett, P.A., 150 South Fifth Street, Suite 1200, Minneapolis, MN 55402, for Plaintiffs.

J. Ashwin Madia and Joshua A. Newville, Madia Law LLC, 345 Union Plaza, 333 Washington Avenue North, Minneapolis, Minnesota 55401, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.      INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment [Doc. No. 95] and Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 99]. For the reasons stated below, the Court denies both Motions.

## II.     BACKGROUND

### A.      Plaintiffs and Their Trademarks

In the mid-1980s, the personal injury law firm of Balkin & Doran, of which Charles Balkin was a founding member, acquired the mnemonic telephone number 1-800-INJURED. (See Boyle Decl. [Doc. No. 98], Ex. 2 (Balkin Dep. 6:1–9:18).) Balkin &

1

Doran began using the telephone number and advertising it on both local and national television and on the radio.  (Id., Ex. 2 (Balkin Dep. 9:19–10:11).)   The firm thereafter obtained a service mark registration for the alphanumeric telephone number 1-800-INJURED, two service mark registrations for 1-800-INJURED plus a design, and a service mark registration for the alphanumeric telephone number 1-888-INJURED (collectively, "the Marks").  (See id., Ex. 3 (USPTO Service Mark Registration Nos. 1,612,296; 1,710,336; 1,789,799; 2,319,670).)

In the late-1980s, Mr. Balkin created Plaintiff Mountain Marketing Group, LLC ("MMG"), a marketing company that licenses mnemonic phone numbers to professional service providers, like law firms and medical offices.  (See id., Ex. 2 (Balkin Dep. 19:3-20) & Ex. 4 (MMG website).)  Each licensee is permitted to use the licensed telephone number in a designated market area.  (See id., Ex. 4 (MMG website).)  All calls to the licensed telephone number that are placed from within that market area are then automatically routed to the relevant licensee.  (See id.)  In 2002, Balkin & Doran assigned the Marks to MMG. (See id., Ex. 5 (Assignment).)

There currently are at least twenty-five licensees of the telephone number 1-800-INJURED in the United States, including Plaintiff John A. Krueger d/b/a Krueger Law Firm ("Krueger"), a Minnesota law firm that has licensed the exclusive right to use the number in Minnesota and Wisconsin since April 2012.  (See id., Ex. 1 (Pls.' Resps. to Def.'s First Set of Discovery Requests at 2–5); Ex. 7 (Trademark License Agreement); Balkin Aff. [Doc. No. 102] ¶ 5.)  Krueger focuses on personal injury claims and draws clients from both Minnesota and Wisconsin.  (See Krueger Decl. [Doc. No. 103] ¶ 2; Boyle Decl., Ex. 9

(Krueger Dep. 9:6-23).)  Some of the other licensees are law firms that also focus on

personal injury claims, (see Boyle Decl., Ex. 19 (Dyer, Garofalo, Mann & Schulz law firm

website) & Ex. 61 (Siegfried & Jensen law firm website)); some are general practice law

firms, (see id., Ex. 21 (Stark & Stark law firm website) & Ex. 37 (Chris Pettit & Associates

law firm website)); and one is a medical and legal referral service, (see id., Ex. 38 (1-800

Injured website)).  A number of these licensees have held their license for over fifteen years.

(See Balkin Aff. ¶ 5.)  Plaintiffs' expert witness, Dr. Larry Chiagouris, Professor of

Marketing at the Lubin School of Business, estimates that the licensees receive a total of

approximately 13,000 phone calls per year from the 1-800-INJURED number (or,

approximately ten calls per licensee per week).  (Chiagouris Decl. [Doc. No. 104], Ex. A

(Expert Report of Dr. Larry Chiagouris ¶¶ 53–54).)

 Each of MMG's licensees is responsible for its own advertising, (see id., Ex. 4

(MMG website)), and they use a variety of advertising techniques.  For example, Krueger

promotes the 1-800-INJURED number on television, radio, billboards, pens, and the law

firm's website.  (Krueger Decl. ¶ 3.)  Other licensees use, for example, television, radio,

billboards, water bottles, coffee cups, and t-shirts.  (See Boyle Decl., Ex. 20 (Sakson Dep.

10:1–11:5); id., Exs. 12–14 (photographs of Dyer, Garofalo, Mann & Schulz promotional

items); id., Ex. 25 (Jensen Dep. 16:16-24).)  Dr. Chiagouris estimates that the average

investment in advertising the 1-800-INJURED mark by MMG's U.S. licensees "in a recent

typical year has been approximately $375,000 per law firm," with an approximate total of

$9 million per year.  (Chiagouris Decl., Ex. A (Expert Report of Dr. Larry Chiagouris

¶ 42).)  Krueger, in particular, invested $90,000 in advertising 1-800-INJURED in 2014 and

expects to invest an additional $200,000 in 2015.  (Krueger Decl. ¶ 4 & Ex. B (Krueger Law Firm Television & Radio Billing).)

### B.    Defendant's Use of 612-INJURED

Defendant Heimerl & Lammers, LLC ("H&L") is a law firm that provides legal services to Minnesota clients in the areas of personal injury, workers' compensation, family law, employment law, wills and trusts, estate planning, bankruptcy, and consumer law.  (See Lammers Decl. [Doc. No. 97] ¶ 3; Boyle Decl., Ex. 31 (Def.'s Resps. to MMG's First Set of Interrogs. at 4).)  In 2013, H&L obtained the telephone number 612-INJURED and the website www.612injured.com.  (See Lammers Decl. ¶ 2; Boyle Decl., Ex. 31 (Def.'s Resps. to MMG's First Set of Interrogs. at 5) & Ex. 35 (www.612injured.com website).)  Michael Lammers, one of H&L's owners, states that he came up with the 612-INJURED number by listing various alphanumeric combinations that spelled out law-related words along with the Twin Cities area codes of 612 and 651.  (Boyle Decl., Ex. 31 (Def.'s Resps. to MMG's First Set of Interrogs. at 5).)  He concedes that he may also have listed combinations that included the toll-free 800 code.  (Jendrzejek Decl. [Doc. No. 109], Ex. A (Lammers Dep. 157:2-11).)  Mr. Lammers then dialed the numbers to see if they were in use.  (Boyle Decl., Ex. 31 (Def.'s Resps. to MMG's First Set of Interrogs. at 5).)  When he discovered that the 612-INJURED number was not in use, he purchased it for $1,000.00.  (Id.)  Mr. Lammers states that he had never seen 1-800-INJURED advertised prior to this time, but that he "probably" dialed that number during his search.  (Jendrzejek Decl., Ex. A (Lammers Dep. 122:4–125:15, 150:7-8).)  He also states that H&L did not perform a trademark search during the selection process.  (Id., Ex. A (Lammers Dep. 155:18–156:5).)

When individuals call 612-INJURED, the person answering the phone at H&L identifies the name of the firm and, if the individual is a new client, opens a "contact file" to record the caller's name and information.  (Lammers Decl. ¶¶ 5–6.)  If an H&L attorney determines that the caller's case might have merit, an in-person meeting is scheduled at the firm's office.  (See id. ¶¶ 7–9.)  A sign at the front door identifies the firm as "Heimerl & Lammers."  (Id. ¶ 10.)  If, at the conclusion of the meeting, the individual decides to retain H&L, the individual must sign a fee agreement also bearing H&L's name.  (See id. ¶¶ 12– 15 & Exs. 2–3 (H&L's Contingency Fee and Workers' Compensation Retainer Forms).)

In the fall of 2013, H&L began working on a billboard campaign to promote its legal services.  (See, e.g., Jendrzejek Decl., Ex. A (Lammers Dep. 175:2–178:1) & Ex. D (Heed Media Proposal dated Nov. 12, 2013).)  In an email with the designer, Mr. Lammers stated:

> I think we want the 612-INJURED to dominate as much as possible.
>
> . . . .
>
> I don't know about colors.  We wanted to try the black and red and white specifically because other people use it.  One, those colors must work since they're used for this type of thing all the time, and two: if there is some confusion by people as to who is who, I think it helps us[.]  We'd be piggybacking on their branding, and our vanity number is easier to remember than theirs. . . .

(Id., Ex. E (Email) (emphasis in original).)  Beginning on November 4, 2013, and continuing for a sixteen-week period, the finalized billboard rotated to four different locations along Interstate 94 and Interstate 494.  (See id., Ex. A (Lammers Dep. 211:10– 212:6) & Ex. F (Email).)  The billboards appeared substantially as follows:



(<u>Id.</u>, Ex. G.)[1]  The marketing firm estimated that the placement of these signs over that

period of time would result in over 4 million "impressions" (or viewings) by individuals

aged eighteen or older.  (See <u>id.</u>, Ex. F (Email).)  H&L commenced a second, similar

billboard campaign in February 2015.  (See <u>id.</u>, Ex. J (Heed Media Documents).)  The

marketing firm estimated that this second campaign would result in over 7.4 million

"impressions."  (See <u>id.</u>)

### C.    Alleged Confusion and This Lawsuit

In November 2013, Dr. Jason Stadther and Tad Treanor, professional acquaintances

of Mr. Krueger, informed Mr. Krueger that they had seen one of his billboards.  (See

Krueger Decl. ¶ 6; Stadther Decl. [Doc. No. 106] ¶¶ 4–5; Treanor Decl. [Doc. No. 107]

¶¶ 3–4.)  Similarly, another professional acquaintance, Dr. Huy Nguyen, informed Mr.

Krueger in April 2015 that he had seen one of Krueger's billboards.  (See Krueger Decl.

¶ 7.)  However, Krueger was not running any billboard advertisements at the time, and it

---

[1] This is an excerpt of the photo contained in the exhibit.

was determined that the billboards belonged to H&L.  (See Krueger Decl. ¶¶ 6–9; Stadther

Decl. ¶¶ 4–5; Treanor Decl. ¶¶ 3–4.)  In addition, in a study conducted by Plaintiffs' expert

witness, Dr. Leon Kaplan of Princeton Research & Consulting Center, Inc., Dr. Kaplan

determined that "[a]lmost fourteen percent (13.9%) of relevant consumers believed that the

firm using the 612-INJURED service mark on a billboard was the firm that had 1-800-

INJURED as its service mark or was the Krueger Law Firm."  (Kaplan Decl. [Doc. No.

105], Ex. A (A Study of the Likelihood of Confusion Between 1-800-INJURED and 612-

INJURED, at 3).)

Meanwhile, on November 8, 2013, counsel for MMG contacted H&L by telephone

and email and requested that H&L cease its use and advertising of the 612-INJURED

number.  (See Jendrzejek Decl., Ex. I (Email).)  When H&L did not comply, Plaintiffs

initiated this lawsuit in January 2014, alleging that H&L has infringed MMG's Marks

through use of the telephone number 612-INJURED and website www.612injured.com.

(First Am. Compl. [Doc. No. 39] ¶¶ 20–27.)  In their First Amended Complaint, Plaintiffs

assert seven causes of action against H&L:  federal trademark infringement (Count I), (id.

¶¶ 33–42); federal unfair competition and false designation of origin (Count II), (id. ¶¶ 43–

47); federal anti-cybersquatting (Count III), (id. ¶¶ 48–57); deceptive trade practices under

Minnesota law (Count IV), (id. ¶¶ 58–63); trademark infringement under Minnesota statute

(Count V), (id. ¶¶ 64–69); trademark infringement under Minnesota common law (Count

VI), (id. ¶¶ 70–75); and unfair competition under Minnesota common law (Count VII), (id.

¶¶ 76–80).  Plaintiffs believe that H&L has converted at least four telephone calls made to

the 612-INJURED number into clients, from whom H&L has generated legal fees and

revenues.  (See Jendrzekek Decl., Ex. M.)  Plaintiffs seek to recover those profits, trebled, as well as to obtain injunctive relief, attorneys' fees, costs, and punitive damages.  (First Am. Compl. at 14–16.)

On July 2, 2015, H&L moved for summary judgment on all of Plaintiffs' claims [Doc. No. 95], and Plaintiffs moved for partial summary judgment on certain liability issues [Doc. No. 99].  The Motions were heard on August 13.[2]

---

[2]    Subsequent to the hearing, H&L filed a letter with the Court requesting permission to supplement the summary judgment record with an expert report that would allegedly refute Plaintiffs' expert on the issue of likelihood of confusion.  (H&L's Letter dated Aug. 24, 2015 [Doc. No. 124] ("H&L's Letter") at 1.)  Although the expert report had been available to H&L at the time the summary judgment motion was filed, H&L decided not to submit it in order "to keep its Summary Judgment motion and responses narrowly focused and to avoid cluttering the record with voluminous documentary evidence."  (Id.)  Plaintiffs opposed H&L's request, arguing that it was not properly presented to the Court under the Federal Rules of Civil Procedure, H&L has not demonstrated excusable neglect for an untimely submission, there is no reason to believe that the report would affect the outcome of the Motions, and a late submission would prejudice Plaintiffs by denying them the opportunity to respond.  (Plaintiffs' Letter dated Aug. 25, 2015 [Doc. No. 125] at 1–2.)

The Court finds that, not only has H&L failed to demonstrate "excusable neglect" for its failure to timely file the expert report, as required under Federal Rule of Civil Procedure 6(b)(1), but that consideration of H&L's expert's report would not affect the Court's rulings herein.  H&L acknowledged in its letter that "the general substance of [the] report was alluded to in Defendant's various briefs," (H&L's Letter at 1), and the Court has fully considered the arguments raised by H&L in its briefing.  While a citation to an expert report may have bolstered those arguments, there is no issue on which the support of expert testimony would have eliminated the issues of fact raised by Plaintiffs. Accordingly, H&L's letter request is denied.

While the Motions were pending, H&L also filed a Motion to Re-Open Discovery, Supplement the Summary Judgment Record With the Resultant Discovery Findings, and to Amend the Pleadings [Doc. No. 126].  H&L sought to conduct additional discovery relating to one of MMG's licensees.  The Magistrate Judge denied that Motion on September 21, 2015, finding that H&L failed to establish the requisite good cause because H&L had received the discovery that it was entitled to prior to the end of the

## III.    DISCUSSION

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp., 477 U.S. at 322–23; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986).  A dispute over a fact is "material" only if its resolution might affect the outcome of the lawsuit under the substantive law.  Anderson, 477 U.S. at 248.  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Id.

Although the party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed, Celotex Corp., 477 U.S. at 323, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256.  Thus, the movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of

---

briefing deadlines for the summary judgment motions.  (Order & Mem. dated Sept. 21, 2015 [Doc. No. 142], at 2, 9, 11.)  The undersigned agrees with the Magistrate Judge's conclusion and reasoning.

proof at trial." <u>Celotex Corp.</u>, 477 U.S. at 322.  No genuine issue of material fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>Id.</u> at 323.

As noted above, both H&L and Plaintiffs have moved for summary judgment. H&L seeks summary judgment on three grounds.  (Def.'s Mem. in Supp. of Its Mot. for Summ. J. [Doc. No. 96] ("H&L's SJ Mem.") at 1.)  First, H&L argues that likelihood of confusion is an element of all seven causes of action, and that there is no likelihood of confusion between MMG's licensees and H&L.  (<u>Id.</u> at 1, 7.)  Second, H&L asserts that the Marks are invalid because they have been abandoned due to non-use and naked licensing.  (<u>Id.</u> at 1.)  Third, H&L argues that there is no basis for a claim of willfulness. (<u>Id.</u> at 2.)

Plaintiffs, on the other hand, seek summary judgment as to liability on Counts I, II, IV, and V.  (Pls.' Mem. of Law in Supp. of Mot. for Partial Summ. J. [Doc. No. 101] ("Pls.' SJ Mem.") at 1.)  More specifically, Plaintiffs argue that it is undisputed that MMG owns the registered trademark for 1-800-INJURED and that H&L's use of its similar mark creates a likelihood of confusion as to the source of the legal services offered.  (<u>Id.</u>)  Accordingly, Plaintiffs assert that they are entitled to a finding of liability as to their claims for trademark infringement, deceptive trade practices, unfair competition, and false designation of origin.  (<u>Id.</u> at 29–30.)

Because H&L is precluded from arguing that Plaintiffs' Marks are invalid due to abandonment, and because there is a genuine issue of material fact regarding likelihood of confusion and willfulness, both Motions are denied.

10

### A.     Abandonment

As a preliminary matter, the Court will address H&L's argument that MMG has abandoned its Marks through nonuse and naked licensing.  H&L argues that, although the Court previously denied its motion to amend its pleadings to assert affirmative defenses of abandonment based on nonuse and naked licensing, the Court must now consider those theories because H&L—in its Answer—denied Plaintiffs' allegations of use of the Marks and pled that "Defendant has not infringed any valid and enforceable trademark right of plaintiff."  (H&L's SJ Mem. at 25 (quoting Answer to First Am. Compl. [Doc. No. 40] at 8).)  According to H&L, validity of the Marks is an element of Plaintiffs' infringement claim, and a defense that rebuts Plaintiffs' prima facie case is not an affirmative defense.  (See id. at 23–26.)  In opposition, Plaintiffs argue that abandonment is an affirmative defense that must be pled and that H&L is precluded from raising the issue now in light of the Court's prior denial of its motion to amend the pleadings to add that affirmative defense.  (Pls.' Mem. of Law in Opp. to Def.'s Mot. for Summ. J. [Doc. No. 112] ("Pls.' Opp.") at 2–4.)  Moreover, Plaintiffs assert, denying an allegation in an answer is not equivalent to asserting an affirmative defense.  (Id. at 4.)

The Court agrees with Plaintiffs.  On February 24, 2015, H&L moved for leave to file an amended answer for purposes of asserting affirmative defenses and counterclaims for cancelation of MMG's trademarks based on the theory of abandonment due to nonuse and naked licensing.  (Def.'s Mot. for Leave to File an Amended Answer [Doc. No. 52] at 1.)  The Magistrate Judge denied that Motion, finding that H&L had not demonstrated the requisite good cause for modifying the Scheduling Order to accommodate its request,

11

and that Plaintiffs would be prejudiced by the untimely addition of the affirmative

defenses.  (Order & Mem. dated Apr. 9, 2015 [Doc. No. 63] at 5–8 & n.3.)  The

undersigned affirmed the Magistrate Judge's Order.  (Mem. Op. & Order dated Apr. 29,

2015 [Doc. No. 67] at 9.)  Accordingly, the affirmative defenses of abandonment based on

nonuse and naked licensing are not at issue in this case.

H&L's attempt to avoid this result by re-characterizing its abandonment arguments

as a rebuttal of Plaintiffs' prima facie case is unavailing.  Abandonment is an affirmative

defense.  See Dakota Indus., Inc. v. Ever Best Ltd., 28 F.3d 910, 913 (8th Cir. 1994) (stating

that the enumerated defenses in the Lanham Act, which include abandonment, "must be

affirmatively pleaded or they will be deemed waived"); Rust Env't & Infrastructure, Inc. v.

Teunissen, 131 F.3d 1210, 1214 (7th Cir. 1997) (stating that "abandonment of a mark is an

affirmative defense to a trademark infringement action"); Atlas Supply Co. v. Atlas Brake

Shops, Inc., 360 F.2d 16, 18 (6th Cir. 1966) ("Abandonment of a trademark is an

affirmative defense which must be pleaded; otherwise it is deemed waived.").  As Plaintiffs

note, affirmative defenses must be pled, and denying allegations in an answer is not the

same as pleading an affirmative defense.  See Fed. R. Civ. P. 8(c)(1) ("In responding to a

pleading, a party must affirmatively state any avoidance or affirmative defense . . . .")

(emphasis added).[3]  And, because none of the cases cited by H&L for the contrary

---

[3]      Although H&L argues that abandonment is not listed in Rule 8(c) as one of the
affirmative defenses that must by pled in a responsive pleading, the Court notes that the
list of affirmative defenses in that Rule is non-exhaustive:  "In responding to a pleading, a
party must affirmatively state any avoidance or affirmative defense, including: . . . ."
Fed. R. Civ. P. 8(c)(1) (emphases added).

proposition actually discuss the proper classification of abandonment or the proper assertion of a theory of abandonment, they are inapposite.  See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 117–20 (2004) (discussing the statutory affirmative defense of fair use); In re Rawson Food Serv., Inc., 846 F.2d 1343, 1344 (11th Cir. 1988) (ruling on a reclamation claim in a bankruptcy appeal); Ford Motor Co. v. Transp. Indem. Co., 795 F.2d 538, 546 (6th Cir. 1986) (stating, in a property damage and insurance case, the general proposition that "[a]n affirmative defense raises matters extraneous to the plaintiff's prima facie case"); Calista Enters. Ltd. v. Tenza Trading Ltd., 43 F. Supp. 3d 1099, 1114 (D. Or. 2014) (discussing trademark validity in the context of an asserted claim for trademark cancelation).  For these reasons, H&L is precluded from arguing that the Marks have been abandoned.

### B.    Likelihood of Confusion

The Court next examines whether either H&L or Plaintiffs are entitled to summary judgment on the issue of likelihood of confusion.  In determining whether there is a likelihood of confusion, the Eighth Circuit examines six factors:

> (1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to "pass off" its goods as those of the trademark owner; (5) incidents of actual confusion; and (6) the type of product, its cost, and conditions of purchase.

Sensient Techs. Corp. v. SensoryEffects Flavor Co., 613 F.3d 754, 763 (8th Cir. 2010) (citation and internal quotation marks omitted).  "'These factors do not operate in a mathematically precise formula; rather, [the court] use[s] them at the summary judgment stage as a guide to determine whether a reasonable jury could find a likelihood of

confusion.'"  Frosty Treats, Inc. v. Sony Computer Entm't Am., Inc., 426 F.3d 1001, 1008

(8th Cir. 2005) (quoting Duluth News–Tribune v. Mesabi Publ'g Co., 84 F.3d 1093, 1096

(8th Cir. 1996)).  No single factor is dispositive.  Sensient Techs. Corp., 613 F.3d at 763.

The Court will examine each factor separately.

### 1.      Strength of the Marks

When evaluating the first factor, strength of the 1-800-INJURED mark, the Court

considers both the mark's conceptual and commercial strength.  Lovely Skin, Inc. v. Ishtar

Skin Care Prods., LLC, 745 F.3d 877, 888 (8th Cir. 2014).  As for conceptual strength,

> [m]arks may be characterized in four categories:  generic, descriptive,
> suggestive, or arbitrary and fanciful.  On this spectrum, an arbitrary or
> fanciful mark is entitled to the highest level of protection, while a generic
> mark is afforded no trademark protection.

Sensient Techs. Corp., 613 F.3d at 763 (internal citations omitted).  In other words, "a

'strong and distinctive trademark is entitled to greater protection than a weak or

commonplace one.'"  Id. (quoting Frosty Treats, Inc., 426 F.3d at 1008).  Relevant here, "[a]

suggestive mark is one that requires some measure of imagination to reach a conclusion

regarding the nature of the product."  Duluth News–Tribune, 84 F.3d at 1096.  "A

descriptive mark, on the other hand, immediately conveys the nature or function of the

product and is entitled to protection only if it has become distinctive by acquiring a

secondary meaning."  Id.  As for commercial strength, the relevant inquiry is public

recognition, which can be demonstrated by consumer surveys or testimony, advertising

expenditures, sales volume, and newspaper and magazine articles.  See Lovely Skin, Inc.,

745 F.3d at 888.

H&L argues that 1-800-INJURED is a "very weak" mark.  (H&L's SJ Mem. at 10.)

In particular, H&L asserts that use of the word "injured" or "injury" is common for personal

injury firms and describes exactly the type of legal services the firm offers and the type of

person who needs such services.  (Id.)  In fact, H&L argues, there are over 187 marks

registered with the U.S. Patent and Trademark Office ("USPTO") that contain one of those

words for use in connection with legal services, and Plaintiffs have admitted in

correspondence with the USPTO that "INJURED" is descriptive.  (Id. at 10–11.)  Finally,

H&L asserts that, because the phone number is used by different licensees, it is not

associated with one source of services and there is no consistent use or advertising of the

mark.  (Id. at 11–13.)

Plaintiffs, on the other hand, assert that not only is H&L prohibited from arguing that

1-800-INJURED is descriptive because the mark has been registered for five years and so is

incontestable, (Pls.' Reply Mem. of Law in Supp. of Mot. for Partial Summ. J. [Doc. No.

18] ("Pls.' Reply") at 7–8), but that the mark is, in fact, suggestive because it requires

imagination to associate the word "injured" with legal services instead of other products and

services concerning injuries, such as medical care products and services or insurance

services, (Pls.' SJ Mem. at 17–18).  Plaintiffs contend that 1-800-INJURED is similar to the

alphanumeric mark 1-800-CONTACTS, which was held to be suggestive in 1-800 Contacts,

Inc. v. WhenU.com, 309 F. Supp. 2d 467 (S.D.N.Y. 2003).  (Id.)  Plaintiffs also take issue

with H&L's summarization of the other registered marks that use the words "injury" or

"injured," pointing out that only three of those marks could be considered phone numbers

and even those are significantly different than 1-800-INJURED.  (Pls.' Opp. at 12–13.)  In

addition, Plaintiffs assert that MMG's reference to the word "injured" as the "descriptive component" of its mark was simply an acknowledgement that it would not object to the descriptive use of that word by a competitor.  (Id. at 13.)  Finally, Plaintiffs argue that 1-800-INJURED's commercial strength is evidenced by the licensees' substantial advertising investments and exclusive use for several years, and by the high volume of phone calls that are directed to the number.  (Pls.' SJ Mem. at 18–19.)

Regarding conceptual strength, the Court finds that 1-800 Contacts, Inc. is instructive.  In that case, the court stated:

> Plaintiff's 1-800 CONTACTS mark is not descriptive, since it does not convey an immediate idea of the ingredients, qualities, or characteristics of the contact lens products sold by Plaintiff, and neither informs a consumer about qualities, ingredients or characteristics nor points to contact lens' intended purpose, function or intended use, size, or merit.
>
> Plaintiff's 1-800 CONTACTS mark is clearly suggestive since, although it may take some imagination to grasp that what Plaintiff markets is contact lenses (as opposed to electrical contacts or business contacts), the mark suggests Plaintiff's product.  Thus, the Court finds that since Plaintiff's mark is suggestive, it is inherently distinctive . . . .

1-800 Contacts, Inc., 309 F. Supp. 2d at 495–96 (internal citations omitted), rev'd on other grounds, 414 F.3d 400 (2d Cir. 2005).  Similarly, here, regardless of 1-800-INJURED's incontestability status, 1-800-INJURED is a suggestive mark.  Like 1-800-CONTACTS, 1-800-INJURED is not descriptive because it does not immediately convey the nature or function of the services offered by Krueger and the other MMG licensees.  Rather, as Plaintiffs argue, it requires some imagination to associate the word "injured" with legal services, as opposed to other injury-related products or services.

Furthermore, H&L takes the purported admission of descriptiveness out of context. In response to an office action by the USPTO relating to the 1-888-INJURED mark, Balkin & Doran stated:

> In this case, Applicant cannot and does not seek to prevent a competitor from using the descriptive <u>component</u> of its mark—the word "injured"—descriptively or generically. <u>Applicant seeks protection against a competitor's use of a confusingly similar composite telephone number trademark.</u> Applicant's competitors are free to use the word "injured" (or "injury" or "injure" or "injuries") descriptively or generically in whatever way they please. . . .

(Boyle Decl., Ex. 36 (Resp. to USPTO Office Action, dated Mar. 30, 1998, at 4 (emphases added)).)  Thus, there was no concession that the 1-888-INJURED mark—let alone the 1-800-INJURED mark—as a whole, was descriptive.  And, even if there was a concession that "injured" is descriptive, the commercial impression of a mark comprised of several parts—like 1-800-INJURED—may be suggestive even if the separate parts are descriptive.  <u>See</u> 2 <u>McCarthy on Trademarks & Unfair Competition</u> § 11:26 (4th ed.).

In addition, Plaintiffs have put forth evidence of the commercial strength of the 1-800-INJURED mark in the form of significant advertising expenditures by Krueger and the other MMG licensees (e.g., an average annual investment of approximately $375,000 per law firm, with approximately $90,000 by Krueger in 2014) toward a variety of advertising techniques (e.g., television, radio, billboards, pens, and websites), as well as the licensees' receipt of approximately 13,000 phone calls annually to 1-800-INJURED (or approximately ten calls per week per licensee).

In response, H&L makes unsubstantiated arguments that the stated amounts of advertising expenditures are "grossly exaggerated."  (H&L's Mem. in Opp. to Pls.' Mot. for

Summ. J. [Doc. No. 114] ("H&L's Opp.") at 11.)  In particular, H&L argues that the $1.2 million figure cited by Plaintiffs' expert as the upper end of the range of advertising expenditures by MMG's licensees was derived from the law firm of Stark & Stark, but that the representative of that firm actually testified that only half of that amount is spent on advertising 1-800-INJURED.  (Id.)  However, not only did H&L neglect to include in the record the pages from the deposition transcript that purportedly contain this information, but Plaintiffs' expert affirmatively stated that the $1.2 million figure relates to a different licensee.  (Reply Chiagouris Decl. [Doc. No. 119] ("Chiagouris Reply Decl.") ¶ 5.)  H&L also argues that the representative of Siegfried & Jensen stated that it uses multiple telephone numbers in its advertisements.  (H&L's Opp. at 11.)  But, that statement was made in response to a general question about that licensee's advertisements and not in the context of the advertising expenditure information provided to Plaintiffs' expert.  (See Boyle Dep., Ex. 25 (Jensen Dep. 15:8–16:15).)  Thus, the statement does not contradict Plaintiffs' expert's testimony that he relied only on the licensees' expenditures that related solely to advertising of the 1-800-INJURED number.  (See Chiagouris Decl., Ex. A (Expert Report of Dr. Larry Chiagouris) ¶¶ 41–42; Chiagouris Reply Decl. ¶ 4.)

Furthermore, H&L's arguments that the commercial strength of 1-800-INJURED is diminished because the mark is associated with the names of the various different licensees, and because many other similar marks are registered for use in conjunction with the provision of legal services, are unpersuasive.  As for the former argument, a mark may properly be licensed to—and associated with—multiple licensees.  See Gen. Motors Corp. v. Gibson Chem. & Oil Corp., 786 F.2d 105, 110 (2d Cir. 1986) (finding, in a case

involving the licensing of a trademark to numerous distributors, that "[a] use of a trademark properly may display only the licensed mark and the name of the licensee"). H&L has provided no authority for the proposition that such licensing weakens a mark. Likewise, H&L has neither provided evidence that the advertising of the 1-800-INJURED mark is inconsistent within a particular licensee's exclusive area nor explained why inconsistencies among various exclusive areas would weaken the mark.[4]

As to the latter argument, H&L relies on One Industries, LLC v. Jim O'Neal Distributing, Inc., 578 F.3d 1154 (9th Cir. 2009). In that case, the Ninth Circuit stated:

> When similar marks permeate the marketplace, the strength of the mark decreases. In a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd.

Id. at 1164 (citation and internal quotation marks omitted). The court went on to hold that the use by the plaintiff's competitors of "O" marks similar to the plaintiff's rounded "O" mark weakened the commercial strength of the plaintiff's mark. Id. at 1164–65. Unlike in One Industries, LLC, where the competitors' marks were all versions of the same stylized letter, however, only three of the 187 purportedly similar marks identified by H&L are phone numbers, and those three phone numbers are presented much differently than Plaintiffs' marks—either in a foreign language or as part of a phrase: "1-800-MI-HERIDA," "MAKE THE CALL…813-INJURY-LAW," and "800-ON-A-BIKE AID TO

---

[4]    To the extent that H&L really is arguing that MMG has abandoned the 1-800-INJURED mark by exercising insufficient control over the licensees' use of the mark—i.e., that MMG has engaged in naked licensing—the Court already has determined that such arguments are precluded.

INJURED MOTORCYCLISTS WWW.ONABIKE.COM."  (Boyle Decl., Ex. 40, at 18, 30,

44.)[5]

## 2.    Similarity between the parties' marks

Under the second factor, similarity between the parties' marks, the Court

"evaluate[s] the impression that each mark in its entirety is likely to have on a purchaser

exercising the attention usually given by purchasers of such products."  Duluth News–

Tribune, 84 F.3d at 1097.  The Court may consider the visual, aural, and definitional

attributes of the marks, but "'[t]he use of identical, even dominant, words in common does

not automatically mean that two marks are similar.'"  Sensient Techs. Corp., 613 F.3d at

764 (quoting Gen. Mills, Inc. v. Kellogg Co., 824 F.2d 622, 627 (8th Cir. 1987)).

Here, H&L argues that "while each party uses the descriptive, unregistrable term

'injured,' the phone numbers are different" because one uses a toll-free code while the other

uses the local area code for Minneapolis.  (H&L's SJ Mem. at 14 (emphasis omitted).)

Plaintiffs, on the other hand, argue that the marks have the same structure, appearance, and

sound; that the dominant feature of the marks is the shared word "INJURED" while the

differing numerical identifiers are used in many telephone numbers; and that consumers are

likely to believe that the numbers are from the same business because many businesses have

both toll-free and local phone numbers.  (Pls.' SJ Mem. at 20–21.)

---

[5]     The Court also notes that H&L's reliance on One Industries, LLC undercuts its
position on the second likelihood-of-confusion factor—i.e., that 612-INJURED is not
similar to 1-800-INJURED.  Although H&L implies here that a mark like "MAKE THE
CALL…813-INJURY-LAW" is "similar" to 1-800-INJURED, H&L goes on to argue in
the next section that a variation in area code alone renders 612-INJURED and 1-800-
INJURED dissimilar.

While the shared use of "INJURED" does not automatically mean that the two marks are similar, there is little else to differentiate these marks.  Rather, 1-800-INJURED and 612-INJURED have a similar structure, appearance, and sound.  And, as Plaintiffs point out, many businesses have both toll-free and local phone numbers.  Accordingly, the only differentiating feature—i.e., toll-free code versus local area code—may not actually serve to differentiate the marks in the eyes of a consumer.  See Dial-A-Mattress Franchise Corp. v. Page, 880 F.2d 675, 678 (2d Cir. 1989) ("[T]he District Court was clearly entitled to conclude that defendant's use of the telephone number 1-800-628-8737 was confusingly similar to plaintiff's telephone number 628-8737 in those area code regions in which plaintiff solicited telephone orders, especially in view of defendant's identification of its number as 1-800-MATTRESS after plaintiff had promoted identification of its number as (area code) – MATTRES."); Murrin v. Midco Commc'ns, Inc., 726 F. Supp. 1195, 1200 (D. Minn. 1989) ("The potential for a law firm advertising itself with the number (800) LAWYERS to encroach on the mark 'Dial LAWYERS' is obvious . . . .").

### 3.    Degree of competition

In terms of the third factor, the degree of competition among the companies' products or services, confusion is more likely where the products are closely related.  Sensient Techs. Corp., 613 F.3d at 766.  The Eighth Circuit in Community of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church noted that confusion may arise where an alleged infringer "utilizes identical or substantially similar marks while offering the same category of services in the same geographical location" as the trademark owner.  634 F.3d 1005, 1009 (8th Cir. 2011).  Accordingly, where the

plaintiff and the alleged infringer used identical or substantially similar marks in connection with the provision of religious services in Independence, Missouri, the court determined that the degree-of-competition factor supported a finding of likelihood of confusion. See id. at 1009–10.  Similarly, in Edina Realty, Inc. v. TheMLSonline.com, a judge in this District determined that this factor weighed in favor of a finding of likelihood of confusion where the parties used identical marks and both offered real estate brokerage services in the Twin Cities-area.  No. Civ. 04-4371 (JRT/FLN), 2006 WL 737064, at *5 (D. Minn. Mar. 20, 2006).

Here, H&L argues that, although both H&L and Krueger have personal injury practices, the degree of competition between them is low because there are hundreds of law firms in the Twin Cities-area that do personal injury work.  (H&L's SJ Mem. at 14.)  H&L relies in part on Mr. Krueger's failure to name any "main" competitors during his deposition for the proposition that H&L is "not a significant competitor" of Krueger.  (Id. (citing Boyle Decl., Ex. 9 (Krueger Dep. 9–10)).)  Plaintiffs, on the other hand, state that Krueger and H&L are "direct competitors" in a "highly competitive" legal market.  (Pls.' SJ Mem. at 22.)  Plaintiffs assert that Krueger and H&L offer the same legal services to the same pool of consumers in the Twin Cities-area.  (Id.)

There seems to be no dispute that Krueger and H&L offer the same category of services (personal injury legal services) in the same geographic location (Twin Cities).  The only purported dispute regarding this factor stems from H&L's assertions that the number of competitors in the personal injury legal services market is relevant.  However, H&L has not cited to any case in support of its position and, in fact, H&L's argument is belied by the

cases discussed above—presumably, there are a high number of competitors in both the

religious services and real estate brokerage services markets, yet neither the Community of

Christ Copyright Corp. nor Edina Realty, Inc. courts discussed that issue.

### 4.    H&L's intent

Under the fourth factor, the Court analyzes "whether the alleged infringer intended to

pass off its goods as the trademark owner's goods." Sensient Techs. Corp., 613 F.3d at 766.

While such intent raises an inference of a likelihood of confusion, a plaintiff need not

present proof of bad intent in order to succeed on an infringement claim. SquirtCo. v. The

Seven-Up Co., 628 F.2d 1086, 1091 (8th Cir. 1980).  In addition, the absence of bad intent

should be considered. Sensient Techs. Corp., 613 F.3d at 766.  According to the Eighth

Circuit, "[k]nowledge of another's product and an intent to compete with that product is

not . . . equivalent to an intent by a new entrant to a market to mislead and to cause

consumer confusion." Id. (citation and internal quotation marks omitted).

H&L argues that there is no evidence that it has attempted to pass its services off as

those of Krueger.  (See H&L's SJ Mem. at 16; H&L's Opp. at 6.)  Rather, H&L asserts, Mr.

Lammers had never seen 1-800-INJURED prior to acquiring 612-INJURED, and H&L's

billboards and website include H&L's name.  (Id. at 15.)  Plaintiffs, on the other hand, argue

that there is ample evidence of H&L's intent to capitalize on the confusion its mark creates

with 1-800-INJURED and to pass itself off as connected with 1-800-INJURED.  (See Pls.'

Opp. at 13–14.)  Among other things, Plaintiffs point to the fact that Mr. Lammers admits

that he probably dialed 1-800-INJURED when coming up with 612-INJURED and so

would have been connected to Krueger, that H&L performed no trademark search prior to

using its mark, that Mr. Lammers expressed in an email to his billboard designer that he wanted to use the same colors as other people because confusion would help H&L by allowing it to "piggyback[] on their branding," that H&L continued to use the 612-INJURED mark after receiving cease-and-desist letters from Plaintiffs, and that H&L commenced a second billboard campaign after this lawsuit was filed.  (See Pls.' SJ Mem. at 23–24.)  Plaintiffs also argue that the identification of the H&L firm name on its billboards is "barely legible," and is intentionally so, as evidenced by Mr. Lammers's instruction that the 612-INJURED mark "dominate."  (Pls.' Opp. at 14.)

While it is true that Mr. Lammers's email does not expressly state an intent to piggyback off of Plaintiffs' branding, in particular, intent may be shown by circumstantial evidence.  See Anheuser-Busch, Inc. v. Balducci Pubs., 28 F.3d 769, 774 (8th Cir. 1994) (applying the likelihood-of-confusion factors and "rel[ying], of necessity, on circumstantial evidence" to analyze intent); Champions Golf Club, Inc. v. The Champions Golf Club, Inc., 78 F.3d 1111, 1121 (6th Cir. 1996) (stating that intent to infringe, in a likelihood-of-confusion analysis, can be shown by circumstantial evidence).  And, here, Plaintiffs have pointed to facts that raise a dispute about H&L's awareness of the 1-800-INJURED mark and the entity with which it is associated prior to adopting its 612-INJURED mark and sending the above-referenced email.

### 5.   Incidents of actual confusion

Under the fifth factor, "weight is given to the number and extent of instances of actual confusion."  Duluth News–Tribune, 84 F.3d at 1098 (citation and internal quotation marks omitted).  In other words, "[the court] look[s] to whether an appreciable number of

ordinary purchasers are likely to be . . . misled." Id.  That being said, "[a] plaintiff is not

required to bring forth incidents of actual confusion to succeed in an infringement case."

Sensient Techs. Corp., 613 F.3d at 768.

In this case, Plaintiffs have put forth evidence of three instances of actual

confusion—that of Dr. Stadther, Mr. Treanor, and Dr. Nguyen—as well as the consumer

survey conducted by Dr. Kaplan, in which it was determined that almost 14% of relevant

consumers believe that the firm using the 612-INJURED mark on a billboard is the firm that

uses the 1-800-INJURED mark or is Krueger.  Plaintiffs point out that applying this figure

to H&L's media company's total estimate of the number of consumer viewings of the 612-

INJURED billboards (i.e., approximately 11.6 million) demonstrates that as many as 1.6

million of the viewings may have resulted in confusion as to the source of the advertised

legal services.  (Pls.' SJ Mem. at 26.)  Plaintiffs also note that, because H&L did not

disclose the names of the individuals who contacted H&L through 612-INJURED,

"Plaintiffs were unable to depose the persons who were in a unique position to testify to

actual confusion."  (Pls.' Reply at 6.)

H&L, on the other hand, asserts that Plaintiffs may only rely on the incident

involving Dr. Stadther because that was the only incident disclosed to H&L during

discovery.  (See H&L's SJ Mem. at 17; H&L's Opp. at 8.)  Even if all three incidents are

considered, H&L argues, they are not evidence of actual confusion because the individuals

involved were not clients or potential clients of Krueger and were not misled into calling

H&L.  (H&L's Opp. at 9–10.)  Finally, H&L contends that, "[a]t best, Plaintiffs' expert

survey shows that a few people might mistake a local vanity number like 612-INJURED as

being a [sic] toll-free number 1-800-INJURED," and that such a mistake is "just a mistake in remembering a phone number" rather than evidence of a likelihood of confusion. (H&L's Opp. at 21.)  And, H&L argues, there is no evidence of the reverse—i.e., that someone meaning to call the toll-free number will mistakenly call the local number.  (Id.)

The Court finds that, even setting aside the evidence regarding Dr. Stadther, Mr. Treanor, and Dr. Nguyen, Plaintiffs have presented admissible evidence of actual confusion through Dr. Kaplan's consumer survey.  Such surveys, if properly conducted, are appropriately considered on the question of actual confusion and are frequently given substantial weight.  Mut. of Omaha Ins. Co. v. Novak, 836 F.2d 397, 400 (8th Cir. 1987). There is no allegation here that Dr. Kaplan's survey was not properly conducted.  And, contrary to H&L's contention, Dr. Kaplan's opinion that roughly 14% of relevant consumers believe that the firm advertising 612-INJURED is the firm that advertises 1-800-INJURED is relevant to the question of whether someone meaning to call Krueger might mistakenly call H&L.  Accordingly, Dr. Kaplan's findings are entitled to substantial weight.

### 6.    Type of product/service at issue

Finally, under the sixth factor, the Court considers the type of products or services at issue, the costs and conditions of purchase, and the degree of care that consumers are expected to exercise.  Sensient Techs. Corp., 613 F.3d at 769; Lovely Skin, Inc., 745 F.3d at 889.  "In considering this factor, [the court] must stand in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods."  Sensient Techs. Corp., 613 F.3d at 769 (citation and internal quotation marks omitted).  Where the products

or services have a high price point, consumers are likely to exercise a greater degree of care in making purchases, thereby reducing the likelihood of confusion.  See Lovely Skin, Inc., 745 F.3d at 889.  Similarly, where the products or services are sold to "sophisticated customers after a collaborative process," potential confusion tends to be mitigated.  Sensient Techs. Corp., 613 F.3d at 769.

H&L argues that the nature of the process of retaining a lawyer—i.e., calling the law firm, speaking with an attorney, meeting with an attorney at the law firm, and signing a fee agreement—negates the possibility of a likelihood of confusion because the client will clearly understand which law firm he or she has retained.  (See H&L's SJ Mem. at 18–20.)  In fact, H&L states that "there is literally no chance that a potential client would ever be confused or mistakenly engage one firm believing it to be another."  (Id. at 21 (emphasis in original).)  H&L further asserts that Plaintiffs are improperly attempting to rely on the initial interest confusion doctrine to support their trademark infringement claim because the Eighth Circuit does not recognize that theory and because any initial confusion by a consumer would be discovered as soon as the consumer's phone call was answered.  (See H&L's Reply Mem. in Supp. of Its Mot. for Summ. J. [Doc. No. 117] at 7; H&L's Opp. at 12–13.)

For their part, Plaintiffs argue that, not only has the initial interest confusion doctrine not been rejected by the Eighth Circuit, but that Plaintiffs are not necessarily relying on that theory because the confusion created by H&L's mark might never be resolved.  (See Pls.' Reply at 11–13.)  Plaintiffs assert that there is no evidence that H&L tells individuals calling 612-INJURED that H&L is not associated with 1-800-INJURED, and that H&L has cited no facts to support its position that a potential client would never engage one law firm while

27

believing it to be a different law firm.  (See id. at 13; Pls.' Opp. at 10.)  Citing Dr.

Chiagouris's report, Plaintiffs argue that consumers who call a 1-800 or 612 phone number

to find an attorney have been found to be generally not college educated and that, even for

more sophisticated individuals, a client who was initially confused about which attorney

was associated with the phone number will likely stay with the attorney that he or she

reaches.  (Pls.' SJ Mem. at 27.)  Plaintiffs also contend that, because the relevant consumers

are retaining an attorney on a contingent-fee basis instead of paying by the hour, they are

likely to exercise a lesser degree of care in making their purchase.  (Id. at 28.)

    As a preliminary matter, the Court notes that the Eighth Circuit has neither rejected

nor adopted the initial interest confusion doctrine, "which arises when confusion creates an

initial customer interest, even though no actual sale may be finally completed due to the

confusion."  Sensient Techs. Corp., 613 F.3d at 766 (citing 4 McCarthy on Trademarks &

Unfair Competition § 23.6 (4th ed.)).  Rather, when presented with a request to formally

adopt the doctrine in Sensient Technologies Corp. v. SensoryEffects Flavor Co., the court

declined because "even if the doctrine applied generally in this circuit, it would not apply in

[that] case."  Id.  Thus, it appears that Plaintiffs could proceed under that theory of

infringement.

    Even if this theory does not apply, however, Plaintiffs correctly point out that H&L

has presented no evidence that its clients who mistakenly called 612-INJURED ever learn

that H&L is not associated with the firm that advertises the 1-800-INJURED number.

Moreover, the Court finds that Plaintiffs have put forth at least some evidence to suggest

that the costs of purchasing personal-injury legal services may be relatively low given that

such services often are provided on a contingent-fee basis, and that the customers attracted

by the billboard advertisements may be relatively unsophisticated.  These facts would

support the notion that the relevant consumers are not likely to exercise a great degree of

care in making their purchase, thereby increasing the likelihood of confusion.  On the other

hand, as H&L's counsel noted at the hearing, someone who has been injured is likely to take

the matter very seriously.  Coupled with the nature of the collaborative process through

which that person ultimately retains his or her attorney, the likelihood of confusion may be

somewhat diminished.

### 7.    Balancing the factors

In conclusion, the Court finds that a reasonable jury could determine that 1-800-

INJURED is a conceptually and commercially strong mark, the 1-800-INJURED and 612-

INJURED marks are similar, Krueger and H&L offer competing services, H&L intended to

pass off its services as being associated with Krueger, there has been some actual confusion,

and the consumers who purchase the legal services at issue are not likely to exercise a high

degree of care.  Accordingly, H&L's Motion is denied.  However, the Court does not find

the evidence presented to be so conclusive as to permit Plaintiffs a finding of likelihood of

confusion as a matter of law.  Therefore, Plaintiffs' Motion also is denied, and the issue

must be resolved at trial.

### C.    Willfulness

Finally, H&L argues that, even if Plaintiffs' trademark infringement claim survives,

there is no evidence in the record that could support a claim for attorney's fees.  (H&L's SJ

Mem. at 39.)  Under the Lanham Act, a court "in exceptional cases may award reasonable

attorney fees to the prevailing party." 15 U.S.C. § 1117(a). "[The Eighth Circuit has] held that when a defendant's unlawful conduct 'was willful and deliberate, the court may well determine that this is the type of exceptional case for which an award of attorney's fees is appropriate.'" Cmty. of Christ Copyright Corp., 634 F.3d at 1013 (quoting Metric & Multistandard Components Corp. v. Metric's Inc., 635 F.2d 710, 716 (8th Cir. 1980)). However, a finding of bad faith is not required for a case to be deemed exceptional. Id.

Here, H&L argues that Plaintiffs' only stated basis for their claim for attorney's fees is that H&L was aware of the Marks prior to Plaintiffs' commencement of this lawsuit but failed to discontinue its use of 612-INJURED. (H&L's Mem. at 40.) H&L asserts that mere knowledge of a trademark is insufficient to demonstrate willfulness, and that Plaintiffs must also show that H&L knew its use of 612-INJURED constituted trademark infringement. (Id.)

In response, Plaintiffs contend that there is ample evidence in the record to raise a genuine issue of material fact as to H&L's willfulness, including that H&L performed no trademark search before using the 612-INJURED mark, H&L acknowledged the benefit of confusing the public by making the text and color of its billboards similar to its competitors' billboards, and H&L continued using the 612-INJURED mark after receiving cease-and-desist letters from Plaintiffs and after Plaintiffs commenced this lawsuit. (See Pls.' Opp. at 15; Pls.' SJ Mem. at 23–24.)

The Court agrees with Plaintiffs. H&L has not cited any Eighth Circuit authority for the proposition that a finding of knowing infringement is necessary for an award of attorney's fees under the Lanham Act. And, in rejecting a bad-faith requirement, the Eighth

Circuit has indicated that the contrary is true.  In fact, in <u>Community of Christ Copyright Corp.</u>, the Eighth Circuit determined that the district court had not abused its discretion in awarding attorney's fees under the Lanham Act for trademark infringement where the defendant knew that the plaintiff owned and used the marks at issue and continued to use those marks after receiving a cease-and-desist letter.  634 F.3d at 1013–14.  Because Plaintiffs have pointed to similar evidence in the present record, the Court finds that H&L is not entitled to summary judgment on the issue of willfulness.

## IV.    ORDER

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Doc. No. 95] is **DENIED**; and

2. Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 99] is **DENIED**.

3. A separate Pretrial Order will follow, setting this matter for trial on Monday, December 14, 2015.


Dated:  September 23, 2015                    s/Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge